**In the Matter of Donald Eugene BUNDLES, Debtor–Appellant.**

**In re Donald Eugene BUNDLES, Appellant,**

**v.**

**William J. BAKER, Indiana National Bank and James C. Wells, Appellees.**

No. 87–2120.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1988.

Decided Aug. 25, 1988.

---

**816**

Judith E. Seubert, UAW Ford Legal Services Plan, Indianapolis, Ind., for debtor-appellant.

Edward B. Hopper, II, Hopper & Cobb, Indianapolis, Ind., for appellee.

Before WOOD Jr., CUDAHY and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In this appeal, we must decide whether a debtor in bankruptcy may set aside under section 548(a)(2) of the Bankruptcy Code (the Code), 11 U.S.C. § 548(a)(2) (Supp. IV 1986), the sale of his personal residence upon foreclosure of the mortgage. The bankruptcy court and the district court held that he could not. We reverse and remand for further proceedings.

I

Background

A. *Statutory Background*

Section 548 of the Code provides in pertinent part:

§ 548. Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; . . . .

11 U.S.C. § 548(a)(2) (Supp. IV 1986).

This provision sets forth four elements that must be established before a debtor [1]

---

**1.** Section 522(h) of the Bankruptcy Code, 11 U.S.C. § 522(h) (Supp. IV 1986), permits the debtor to seek avoidance of a transfer under § 548 if the trustee has not done so. *See also* 4

may set aside a transfer of property. These are: (1) the debtor had an interest in the property transferred; (2) the debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer; (3) the transfer occurred within one year of the filing of the bankruptcy petition; and (4) the transfer was for less than a "reasonably equivalent value." The parties agree that the debtor has established each of these elements except the last.[2] Therefore, the only issue before us is whether the debtor received less than a reasonably equivalent value for the property in question.

### B. Facts

The facts are stipulated. The debtor-appellant Donald Eugene Bundles has maintained a residence in Indianapolis, Indiana since 1964. Sometime in 1984 and 1985, due to various financial and health problems, Mr. Bundles was unable to meet his mortgage payments. On March 4, 1985, the mortgagee, Indiana National Bank (INB), commenced an action in state court seeking foreclosure of Mr. Bundles' residence. On July 10, 1985, the state court entered a default judgment against Mr. Bundles in the amount of $4,696.46. In addition, an IRS tax lien against the real estate was reduced to a personal judgment against Mr. Bundles in the amount of $2,666. A sheriff's sale of Mr. Bundles' residence was scheduled and held on September 11, 1985, after proper notice and in compliance with Indiana foreclosure law. As of this date, Mr. Bundles was insolvent. The property was purchased at the sale by William J. Baker for $5,066.80. The value of the property at this time was $15,500.[3] On September 12, 1985, Sheriff James L. Wells of Marion County executed a deed to Mr. Baker conveying Mr. Bundles' residence to him. The deed to the property was recorded on September 24, 1985.

On September 25, 1985, after the foreclosure and sale of his residence, Mr. Bundles filed a voluntary petition under Chapter 13 of the Code. Thereafter, on November 14, 1985, he filed a complaint in the bankruptcy court to set aside the foreclosure sale as a fraudulent conveyance. The complaint named as defendants Mr. Baker, the purchaser of his home; INB, the foreclosing mortgagee; and James C. Wells in his official capacity as the Sheriff of Marion County, Indiana.

### C. The Bankruptcy Court Opinion

Under section 548, as we have noted already, a debtor in bankruptcy may set aside a transfer of his property as a fraud-

---

L. King, *Collier on Bankruptcy* ¶ 522.30 at 522–98 (15th ed. 1988).

**2.** There is no dispute in this case over whether a foreclosure sale constitutes a "transfer" for purposes of § 548(a). *Compare Durrett v. Washington Nat'l Ins. Co.,* 621 F.2d 201, 204 (5th Cir. 1980) (transfer of the debtor's equity interest in the property upon foreclosure constitutes a transfer of an interest in property under § 548(a)) *with Madrid v. Lawyers Title Ins. Corp. (In re Madrid),* 725 F.2d 1197 (9th Cir.) (the only transfer that is relevant under § 548(a) occurs when the mortgage is perfected rather than when the foreclosure sale takes place), *cert. denied,* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). This is because the debtor's property was not transferred in trust to the mortgagee at the time of the creation of the debt. Rather, pursuant to Indiana law, the mortgagee received a security interest only. Legal title to the property was retained by the debtor-mortgagor. Consequently, the only transfer in this case occurred when the debtor's legal title to the property was transferred at the foreclosure sale. This transfer occurred within the one year period required by § 548. We also

note that many courts now consider the transfer issue to have been resolved definitively by the 1984 Amendments to the Bankruptcy Code, *see infra* note 4, in favor of the *Durrett* approach. *See General Indus. v. Shea (In re General Indus.),* 79 B.R. 124, 129–30 (Bankr.D.Mass.1987); *Butler v. Lomas & Nettleton Co. (In re Butler),* 75 B.R. 528, 531 n. 2 (Bankr.E.D.Penn.1987); *Verna v. Dorman (In re Verna),* 58 B.R. 246, 250 (Bankr.C.D.Cal.1986); *Ruebeck v. Attleboro Sav. Bank (In re Ruebeck),* 55 B.R. 163, 167 (Bankr.D. Mass.1985). *But see In the Matter of Winshall Settlor's Trust,* 758 F.2d 1136, 1138–39 n. 3 (6th Cir.1985).

**3.** The parties' stipulation of facts provides that the property was worth $15,500 on November 14, 1985, the date that Mr. Bundles filed his complaint to set aside the conveyance in the bankruptcy court. Stipulation As To Facts at 2, Record of Proceedings. At oral argument, the appellant indicated that this figure was arrived at after each party had his own appraisal done and a single figure was agreed upon.

ulent conveyance if he received less than a reasonably equivalent value for the property. In this case, the bankruptcy court held that Mr. Bundles had received a reasonably equivalent value for his home and therefore denied his complaint to set aside the transfer. The bankruptcy court determined that "any avoiding effect accorded a low purchase price by Section 548(a)(2)(A) is misplaced and overbroad with respect to regularly conducted, noncollusive foreclosure sales." *Bundles v. Baker (In re Bundles)*, 61 B.R. 929, 936 (Bankr.S.D.Ind. 1986), *aff'd*, 78 B.R. 203 (S.D.Ind.1987). Therefore, the court held that the sale price obtained at a regularly conducted, noncollusive foreclosure sale should be presumed to constitute a reasonably equivalent value under section 548(a)(2)(A). *Id.*

In reaching this conclusion, the bankruptcy court focused primarily on legislative history and legislative intent. First, the court examined the legislative history of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (BAFJA).[4] Although the court found that the plain language of the amended statute allows avoidance of foreclosure sales, it nonetheless determined that this language conflicted with the obvious intent of the drafters of the amendments. This intent, the court concluded, was to "preserve rather than avoid regularly conducted, noncollusive foreclosure sales." *Id.* at 934.

Second, the court examined the historical roots of section 548. It noted that section 548 developed from the English law of fraudulent conveyances dating back to a 1570 statute enacted by the Parliament of Queen Elizabeth I. *Id.* at 935. The purpose of fraudulent conveyance law was "to prevent the debtor from taking deliberate action to hinder, delay, or defraud his creditors." Alden, Gross, and Borowitz, *Real Property Foreclosure as a Fraudulent Conveyance: Proposals for Solving the Durrett Problem*, 38 Bus.Law. 1605, 1605 (1983). As a result, fraudulent conveyance law originally focused solely on the debtor's subjective intent to defraud his creditors. American adaptation of this law in the Code, however, extended its reach "to cases where the objective result of the transaction is detrimental to creditors, whether or not the debtor actually intended such detriment." *Id.* at 1605–06 (footnote omitted). Despite the shift in American bankruptcy law from focus on subjective intent to focus on objective results, the bankruptcy court concluded that "Section 548(a)(2) [was] designed to produce '... the same substantive results as the Statute of 13 Elizabeth [i.e., to invalidate only transfers made with actual intent to defraud].*'*" *Bundles*, 61 B.R. at 935 (quoting Zinman, Houle & Weiss, *Fraudulent Transfers According to Alden, Gross, and Borowitz: A Tale of Two Circuits*, 39 Bus. Law. 977, 991 (1984) (footnote omitted)).

## D. *The District Court Opinion*

The district court reached a similar result as the bankruptcy court albeit by a somewhat different route. The district court held that "the reasonable equivalency standard should be ... irrebuttably satisfied where property is sold at a regularly conducted, non-collusive foreclosure sale *to a third party purchaser* and where the deed to the property is executed and recorded before the debtor filed his bankruptcy peti-

---

**4.** The Bankruptcy Amendments and Federal Judgeship Act (BAFJA) was drafted in 1984 to address, *inter alia*, the issue in this case. An excellent discussion of the BAFJA's legislative history is provided by the bankruptcy court in *In re Verna:*

> [The BAFJA] proposed ... three changes in the Bankruptcy Code: (i) [an amendment to] the definition of "transfer" in section 101 of the Bankruptcy Code to specify that it encompasses the "foreclosure of the debtor's equity of redemption"; (ii) [an amendment to] section 548 to emphasize its applicability to transfers where the debtor "voluntarily or in-

voluntarily" receives less than reasonably equivalent value; and (iii) [an amendment to section 548] granting an irrebuttable presumption of reasonably equivalent value to any mortgagee or third-party purchaser who purchases mortgaged property at a regularly conducted non-collusive foreclosure sale for a price equal to the full amount of the mortgage debt.

58 B.R. at 250 (footnote omitted). As we shall discuss later in the text, only the first two provisions were enacted into law. *Id.; see* text accompanying note 9.

tion." *Bundles v. Baker (In re Bundles),* 78 B.R. 203, 208 (S.D.Ind.1987) (emphasis supplied). Unlike the bankruptcy court, the district court limited its holding to the facts before it; the court applied the irrebuttable presumption only to the situation where the property was sold to a third-party purchaser and declined to decide whether the same irrebuttable presumption would apply if the mortgagee had purchased the property at the foreclosure sale. The district court reasoned that this limitation is justified on the theory that, where the property is sold to a third party, the sale is more likely to have been the result of competitive bidding thereby assuring that a fair price was given. *Id.* at 208–10.

In reaching this result, the district court reviewed the legislative history of the BAFJA and determined that it was inconclusive. *Id.* at 206. Therefore, instead of focusing on statutory interpretation, the district court directed its attention to the policy concerns raised by the parties. The policy issue, in the court's view, was one of defining the proper relationship between federal bankruptcy law and nonbankruptcy state law. This relationship has been addressed by the Supreme Court in *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). The district court interpreted *Butner* as counseling that courts should not use section 548, or any other provision of the Code, "to alter existing property interests under state law absent an overriding federal interest." *Bundles,* 78 B.R. at 209. In this case, the court determined, both state foreclosure law and federal fraudulent conveyance law seek to protect creditors. The court continued that state foreclosure law achieves this goal by maximizing the likelihood of competitive bidding at foreclosure sales. As a result, the court concluded, there is no overriding policy underlying section 548 that would justify intervening and changing the rights of creditors as established under state law. *Id.*

## II

### Discussion

We must interpret the phrase "reasonably equivalent value" as applied to a foreclosure sale. Our task is complicated by the fact that reasonably equivalent value is not defined in section 548 or in any other provision of the Code. The courts addressing this issue have expressed a variety of viewpoints. Nevertheless, two basic lines of authority, each espousing a different interpretation of reasonably equivalent value as that term is used in section 548(a)(2)(A), have developed. We begin by reviewing the cases on either side of this difference of opinion among the courts.

### A.

■ The two seminal cases in this area are *Durrett v. Washington National Insurance Co.,* 621 F.2d 201 (5th Cir.1980), and *Lawyers Title Insurance Co. v. Madrid (In re Madrid),* 21 B.R. 424 (Bankr. 9th Cir.1982), *aff'd on other grounds,* 725 F.2d 1197 (9th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984). Their precise holdings have ultimately come to be less important than the analytical approach that each has fostered in subsequent cases. Courts have interpreted *Durrett* as standing for the position that reasonably equivalent value in the foreclosure context should be determined as a set percentage of the fair market value of the property, with 70 percent being the appropriate benchmark. Similarly, courts have interpreted *Madrid* as representing the position that the sale price obtained at a regularly conducted, noncollusive foreclosure sale should be presumed conclusively to be the reasonably equivalent value for purposes of section 548(a)(2)(A). Bankruptcy courts have followed both approaches. *Compare, e.g., Butler v. Lomas & Nettleton Co. (In re Butler),* 75 B.R. 528, 531–32 (Bankr.E.D.Penn.1987); *Federal Nat'l Mortgage Ass'n v. Wheeler (In re Wheeler),* 34 B.R. 818 (Bankr.N.D.Ala.1983); *Cooper v. Smith (In re Smith),* 24 B.R. 19 (Bankr.W.D.N.C.1982); *Wickham v. United Am. Bank (In re Thompson),* 18 B.R. 67 (Bankr.E.D.Tenn.1982) (all following *Durrett*) *with Verna v. Dorman (In re Verna),* 58 B.R. 246 (Bankr.C.D.Cal.1986); *In re Ristich,* 57 B.R. 568 (Bankr.N.D.Ill.

1986); *Strauser v. Veterans Admin. (In re Strauser),* 40 B.R. 868 (Bankr.N.D.Ohio 1984) (all following *Madrid* ). The bankruptcy court and the district court in this case both followed *Madrid.* Because of the influential impact of *Durrett* and *Madrid* on subsequent judicial interpretation of section 548(a)(2)(A), a more thorough discussion of these two cases is in order.

*Durrett* was decided under section 67(d) of the former Bankruptcy Act, 11 U.S.C. § 107(d), which employed the term "fair consideration" rather than "reasonably equivalent value." In reversing the trial court's determination that a sale price of 57.7 percent of the fair market value of the property on the date of the foreclosure sale was a fair equivalent, the Fifth Circuit stated that it had been unable to locate a decision of any court that approved a transfer for less than 70 percent of the market value of the property. *Durrett,* 621 F.2d at 203. The court's reference to 70 percent has led other courts and commentators to read that opinion as establishing a fixed percentage mark—the so-called *"Durrett* 70 percent rule." However, the Fifth Circuit's actual approach in *Durrett* is one of simply analyzing the question of reasonably equivalent value in terms of whether the foreclosure sale price is some acceptable percentage of the fair market value of the property.

*Durrett* is certainly not without its critics. In *Madrid,* a bankruptcy panel of the Ninth Circuit was the first court to reject *Durrett's* percentage rule and to articulate a different standard. The *Madrid* court noted that the only case cited by the Fifth Circuit in support of its holding involved a voluntary transfer of real property by the debtor corporation to the mother of the principal stockholder of the debtor corporation. 21 B.R. at 426 (the case was *Schafer*

*v. Hammond,* 456 F.2d 15 (10th Cir.1972)). The *Madrid* court opined that, "[h]owever valid it may be to hold that less than 70 percent of fair market value is not a fair equivalent for a private transfer to an insider, application of that standard to regularly conducted public sales is questionable." *Id.* Its own research, the court observed, did not reveal any cases, other than the Fifth Circuit's decisions in *Durrett* and *Abramson v. Lakewood Bank & Trust Co.,* 647 F.2d 547 (5th Cir.1981) (per curiam), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982),[5] where a nonjudicial foreclosure sale was set aside on fraudulent conveyance grounds. Furthermore, the *Madrid* court was concerned that the *Durrett* approach would alter radically state foreclosure law under which the mere inadequacy of price is usually insufficient to upset a foreclosure sale.[6] *Id.* at 427. Consequently, the court reasoned that "[t]he law of foreclosure should be harmonized with the law of fraudulent conveyances." *Id.*

Based on the above analysis, the *Madrid* court held that "the consideration received at a non-collusive and regularly conducted foreclosure sale" should be presumed to be the reasonable equivalent value for purposes of section 548. *Id.* Applying this holding to the facts before it, the *Madrid* court upheld a foreclosure sale where the debtor received a price between 64 and 67 percent of the market value of the property at the time of the sale. The bankruptcy panel's opinion in *Madrid* was affirmed by the Ninth Circuit on different grounds. 725 F.2d 1197 (9th Cir.1984).[7] Nevertheless, its reasoning has been followed, as we have noted already, by several bankruptcy courts, and recently was adopted in dictum by the Sixth Circuit in *In the Matter of*

---

5. In *Abramson v. Lakewood Bank & Trust Co.,* 647 F.2d 547 (5th Cir.1981) (per curiam), *cert. denied,* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982), the Fifth Circuit remanded a district court's decision for reconsideration in light of *Durrett.*

6. *See generally* Annotation, *Inadequacy of Price as Basis for Setting Aside Execution or Sheriff's Sale—Modern Cases,* 5 A.L.R.4th 794 (1981).

7. In affirming the bankruptcy panel's decision in *Madrid,* the Ninth Circuit held that a foreclosure sale is not a "transfer" within the purview of § 548(a) and declined to address the reasonably equivalent value issue. *In re Madrid,* 725 F.2d 1197. The question of whether a foreclosure sale is a transfer of the debtor's interest is not at issue in this case. *See supra* note 2.

*Winshall Settlor's Trust,* 758 F.2d 1136, 1139 (6th Cir.1985) ("the better view is that reasonable equivalence for the purposes of a foreclosure sale under § 548(a)(2)(A) should be consonant with the state law of fraudulent conveyances").

**B.**

We begin our analysis, as did the bankruptcy court and the district court, with the language of the statute. Section 548(a)(2)(A) provides that a transfer of the debtor's property may be set aside if it is transferred for less than a reasonably equivalent value. It makes no distinction between sales that do and sales that do not comply with state law. If we take the statute at its face value, we must conclude that its unambiguous language requires the reviewing court to make an independent assessment of whether reasonable equivalence was given.

Our analysis of the statutory language is not altered by the legislative history of the BAFJA. This legislative history, consisting of an exchange between two Senators recorded after the BAFJA was passed, indi-

cates only that the amendments were not intended to resolve the so-called *"Durrett* issue." [8] Furthermore, one of the proposed amendments to the BAFJA dealt specifically with the *Durrett–Madrid* debate and adopted the *Madrid* irrebuttable presumption rule.[9] This amendment, however, was not included in the bill that ultimately became law. Accordingly, we believe that the most reasonable interpretation of the legislative history is that Congress did not legislate an irrebuttable presumption in the case of mortgage foreclosure sales.

Nevertheless, INB urges us to adopt state foreclosure law as the federal rule of reasonable equivalence under section 548. Under INB's theory, if a low sale price does not vitiate a foreclosure sale under state law, the bankruptcy court should not permit the reasonable equivalence standard in section 548 to produce such a result. INB's argument is similar to the position adopted by the district court. The district court held that state law should be used in fashioning a federal rule; INB appears to argue that the state rule for setting aside a foreclosure sale should be itself controlling, *see* Appellee's (INB) Br. at 16–17.[10]

**8.** The legislative history, cited to us by the parties and relied on by the bankruptcy court, is as follows:

Mr. DeCONCINI. Apparently there may have been some misunderstanding regarding the effect of certain technical amendments made by the recently enacted bankruptcy legislation ... which amended the definition of transfer ... to add the phrase "and foreclosure of the debtor's equity of redemption," ... [and amended] section 548(a) ... to add the phrase "voluntarily or involuntary." A question has arisen whether these amendments somehow support the position taken ... in *Durrett....* My understanding is that these provisions were not intended to have any effect one way or the other on the so called Durrett issue. Is my understanding correct?

Mr. DOLE. The Senator's understanding is indeed correct. ... In deference to Senator METZENBAUM's position, Senator THURMOND agreed to delete from his amendment all provisions dealing with the Durrett issue.... Consequently, no provision of the bankruptcy bill passed by this body was intended to intimate any view one way or the other regarding the correctness of the position taken ... in the Durrett case, or regarding the correctness of the position taken by ... Madrid,.... which reached a contrary result.

... [T]he amendment should not be construed to in any way codify Durrett or throw a cloud over noncollusive foreclosure sales. ... Finally, neither of the [amendments] purport to deal with the question of whether a noncollusive, regularly conducted foreclosure sale should be deemed to be for a reasonably equivalent value.

Mr. DeCONCINI. Then I am correct in concluding that parties in bankruptcy proceedings who seek avoidance of prepetition foreclosure sales would find no support for their arguments in these amendments?

Mr. DOLE. The Senator's conclusion is correct.

130 Cong.Rec.S. 13771–S.13772 (No. 131, Pt. II, Oct. 5, 1984).

**9.** *See supra* note 4.

**10.** Under INB's theory, if state law *permitted* the setting aside of a foreclosure sale based upon inadequacy of price, then presumably so would § 548(a)(2)(A). The parties disagree over the circumstances under which Indiana law would permit a mortgagor to set aside the foreclosure sale of his property. Mr. Bundles asserts that avoidance of the foreclosure sale under § 548(a)(2)(A) does not conflict with state foreclosure law because Indiana courts will set aside a foreclosure sale if the inadequacy of the

INB relies, as did the district court, on the Supreme Court's opinion in *Butner v. United States,* 440 U.S. 48, 54, 99 S.Ct. 914, 917, 59 L.Ed.2d 136 (1979), in support of its argument that state law should be controlling here. In *Butner,* the issue was whether the right to rents collected during the period between the mortgagor's bankruptcy and the foreclosure sale of the mortgaged property should be determined by a federal rule of equity or by state law. The Court held that, where Congress has not exercised its power to establish laws governing bankruptcies,[11] state law should be applied.

*Butner* is inapposite to this case. Here, Congress has not left the determination of property rights to state law. Rather, Congress has enacted a *federal* rule defining when a foreclosure sale may be set aside in bankruptcy. The *Butner* Court expressly recognized as much when it said:

> The constitutional authority of Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States" would clearly encompass a federal statute defining the mortgagee's interest in the rents and profits earned by property in a bankrupt estate. But Congress has not chosen to exercise its power to fashion any such rule. *The*

*Bankruptcy Act does include provisions invalidating certain security interests as fraudulent,* or as improper preferences over general creditors. *Apart from these provisions,* however, Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.

*Id.* at 54, 99 S.Ct. at 917 (footnotes omitted) (emphasis supplied). In an accompanying footnote, the Court listed 11 U.S.C. § 107(d) [of the old Bankruptcy Act] [presently codified at § 548(a) of the Code] as an example of a provision in which Congress has established a federal property rule for bankruptcy. *Id.* at 54 n. 8, 99 S.Ct. at 917 n. 8. Accordingly, we must reject the view that state law, either directly or as the federal rule of decision, should determine the outcome of a bankrupt's complaint under section 548(a)(2)(A). Here, Congress has set forth a federal standard. We must give effect to that congressional will, however ambiguous its manifestation.

We realize that much of the debate over this issue has centered on policy considerations that favor one result over the other.[12] However, " 'the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the

---

sale price is "so gross as to shock the conscience." *Fletcher v. McGill,* 110 Ind. 395, 10 N.E. 651, 654 (1887). INB, on the other hand, argues that mere inadequacy of price alone is insufficient to justify setting the sale aside under Indiana law. *See Arnold v. Melvin R. Hall, Inc.,* 496 N.E.2d 63, 65 (Ind.1986). Because we do not believe that state law should be applied irrebuttably in this context, we need not decide this question of state law.

**11.** *See* U.S. Const. art. I, § 8, cl. 4.

**12.** The central policy concern expressed in the opinions is that permitting avoidance of foreclosure sales under § 548(a)(2) would have a negative effect on the foreclosure market. This concern was best voiced by Judge Clark in his dissenting opinion in *Abramson,* 647 F.2d 547. Judge Clark believed that the *Durrett* rule would "cast a cloud upon mortgages and trust deeds" and that this cloud would "naturally inhibit a purchaser other than the mortgagee from buying at foreclosure" thereby tending to "depress further the prices of foreclosure sales and thus increase the potential size of the deficiency in

each foreclosure." *Id.* at 550 (Clark, J., dissenting). *But see* Schuckman, *Data on the Durrett Controversy,* 9 Cardozo L.Rev. 605 (1987) (arguing that there is no empirical evidence that the effect of the *Durrett* rule on the foreclosure market has been to reduce participation in foreclosure sales, increase mortgage interest rates or reduce the amount of individual mortgage loans).

In *Goldberg v. Tynan (In the Matter of Tynan),* 773 F.2d 177 (7th Cir.1985), we expressed a similar view in rejecting the argument that the court should toll the running of the state redemption period until the debtors' Chapter 13 plan was completed. We stated that, "[i]f we were to adopt their [the debtors'] position, we would cloud every title secured through a foreclosure sale due to the possible filing of a voluntary petition in bankruptcy during the statutory redemption period." *Id.* at 179. *Tynan,* however, did not involve a specific provision in the Code that permitted the court to toll the state redemption period. In contrast, § 548(a)(2)(A) establishes a federal rule of bankruptcy which permits the avoidance of an involuntary transfer for less than reasonably equivalent value.

constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms.'" *Central Trust Co. v. Official Creditors' Comm. of Geiger Enters.*, 454 U.S. 354, 359–60, 102 S.Ct. 695, 698, 70 L.Ed.2d 542 (1982) (per curiam) (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). It is beyond our scope of review to consider the policy implications of permitting the debtor to set aside the foreclosure of his home. Any change deemed desirable on policy grounds should be addressed to Congress rather than to this court. Our duty is simply to interpret the language of the statute. *Accord Hulm v. First Fed. Sav. & Loan Ass'n (In re Hulm)*, 738 F.2d 323, 327 (8th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 331 (1984).

Implying an irrebuttable presumption would be inconsistent with that language. Such a reading, in effect, creates an exception to the trustee's avoiding powers under section 548(a)(2)(A)—an exception not otherwise found in the statute—for property sold at a foreclosure sale. *See In re Madrid*, 21 B.R. at 428 (Volinn, J., dissenting) ("By concluding that a regularly conducted sale in the absence of collusion satisfies the 'reasonably equivalent value' test, the majority has excised vital language from § 548 in order to create an exception to the statute where a forced sale of the debtor's property is involved."); *Richardson v. Gillman (In re Richardson)*, 23 B.R. 434, 446 (Bankr.D.Utah 1982) ("fixing an irrebuttable presumption of reasonable equivalence for non-collusive, regularly conducted public sales proscribes the factual inquiry into 'reasonable equivalence' which Section 548(a)(2) was designed to facilitate"). Moreover, an irrebuttable presumption has the effect of reading good faith into section 548(a)(2)(A); as long as the sale is conduct-ed in good faith and in accordance with state law, the sale price is conclusively presumed to be a reasonably equivalent value. This result is inconsistent with section 548(a)(2)'s purpose of permitting the trustee to avoid transfers as constructively fraudulent, irrespective of the parties' actual intent. *See Richardson*, 23 Bankr. at 447; 4 L. King, *Collier on Bankruptcy* ¶ 548.02 at 548–28, ¶ 548.03 at 548–49 (15th ed. 1988); Ehrlich, *Avoidance of Foreclosure Sales As Fraudulent Conveyances: Accommodating State and Federal Objectives*, 71 Va.L.Rev. 933, 956 (1985). Finally, an irrebuttable presumption renders section 548(a)(2) merely duplicative of other Code provisions, such as section 548(a)(1) [13] (permitting avoidance for actual intent to defraud) and section 544(b) [14] (permitting avoidance where state law would allow it), *see Richardson*, 23 B.R. at 447 ("insofar as *Madrid* permits an attack under Section 548 on the good faith of a foreclosure sale, it merely duplicates rights which the trustee already has under the law of most states through Section 544(b)"). We therefore conclude that section 548(a)(2)(A) establishes a federal basis —independent of state law—for setting aside a foreclosure sale.

## C.

▮ Having determined that there is a federal statutory basis for avoiding a foreclosure sale under section 548(a), we are confronted with the problem of defining that federal standard. As Justice Brandeis once observed, "[v]alue is a word of many meanings." *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Serv. Comm'n*, 262 U.S. 276, 310, 43 S.Ct. 544, 554, 67 L.Ed. 981 (1923) (Brandeis, J., concurring). A good example of this observation is in the Code where value is defined differently

---

**13.** Section 548(a)(1) provides that a trustee may avoid a transfer if the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; ...." 11 U.S.C. § 548(a)(1) (Supp. IV 1986).

**14.** Section 544(b) provides that:

The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title. 11 U.S.C. § 544(b) (1982).

throughout. For instance, section 522(a)(2) refers to "fair market value as of the date of the filing of the petition," 11 U.S.C. § 522(a)(2) (Supp. IV 1986), and section 506(a) refers to value "determined in light of the purpose of the valuation and of the proposed disposition or use of such property," 11 U.S.C. § 506(a) (1982). The definition of value found in section 548 is not very useful for our purposes. It defines value as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor...." 11 U.S.C. § 548(d)(2)(A) (Supp. IV 1986). If anything is clear from the various uses of the word "value" in the Code, it is that Congress did not mean fair market value when it used the term reasonably equivalent value. On the other hand, Congress' conscious use of a federal standard suggests that it did not believe that the expedient of relying entirely on state foreclosure law would protect adequately federal interests. "State law's sanction of exchanges in foreclosures which are not reasonably equivalent gives effect to state contract and foreclosure policy but may overlook the interests of other creditors of the debtor." *In re Richardson*, 23 B.R. at 447.

In our view, in defining reasonably equivalent value, the court should neither grant a conclusive presumption in favor of a purchaser at a regularly conducted, noncollusive foreclosure sale, nor limit its inquiry to a simple comparison of the sale price to the fair market value. Reasonable equivalence should depend on all the facts of each case. This middle ground has been adopted by several of the bankruptcy courts. *See, e.g., General Indus. v. Shea (In re General Indus.),* 79 B.R. 124 (Bankr. D.Mass.1987); *Adwar v. Capgro Leasing Corp. (In re Adwar),* 55 B.R. 111 (Bankr.E. D.N.Y.1985); *Ruebeck v. Attleboro Sav. Bank (In re Ruebeck),* 55 B.R. 163 (Bankr. D.Mass.1985); *First Fed. Sav. & Loan Ass'n v. Hulm (In re Hulm),* 45 B.R. 523 (Bankr.D.N.D.1984); *In re Richardson,* 23 B.R. at 448; *see also In re Madrid,* 21 B.R. at 428 (Volinn, J., dissenting) (arguing that the concept of reasonably equivalent value

requires that the trial court examine the consideration received in a foreclosure sale in the factual context of a particular case and concluding that the price paid at a regularly conducted foreclosure sale should be given, at best, a strong presumption of adequacy).

The implementation of this approach requires case-by-case adjudication. In determining whether property was sold for reasonably equivalent value, the bankruptcy court must, of course, be mindful constantly of the purpose of section 548's avoiding powers—to preserve the assets of the estate. *See Martin v. Phillips (In re Butcher),* 58 B.R. 128, 130 (Bankr.E.D. Tenn.1986); *In re Richardson,* 23 B.R. at 447. This consideration requires that, in determining reasonably equivalent value, the court must focus on what the debtor received in return for what he surrendered. *See In re Butcher,* 58 B.R. at 130; *Meister v. Jamison (In re Jamison),* 21 B.R. 380, 382 (Bankr.D.Conn.1982). Consequently, it is appropriate to consider, as a starting point, the fair market value. However, the fact that the sale was the result of a foreclosure rather than an arm's length transaction between a willing buyer and a willing seller is also of considerable importance. Therefore, the bankruptcy court must focus ultimately on the fair market value as affected by the fact of foreclosure. As a practical matter, the foreclosure sale price is the only means of measuring the effect of foreclosure on the value of the property. Indeed, in usual circumstances, it would be appropriate to permit a *rebuttable* presumption that the price obtained at the foreclosure sale represents reasonably equivalent value. However, the bankruptcy court also must examine the foreclosure transaction in its totality to determine whether the procedures employed were calculated not only to secure for the mortgagee the value of its interest but also to return to the debtor-mortgagor his equity in the property. The bankruptcy court therefore must consider such factors as whether there was a fair appraisal of the property, whether the property was advertised widely, and whether competitive bidding was encouraged.

The inquiry outlined in the foregoing paragraph is necessarily a fact-specific one; it will require the bankruptcy court to draw upon its expertise in evaluating the economic forces at play in a specific case. Once that determination is made, we must accord it great deference. On the other hand, we shall expect the bankruptcy court, while recognizing that it alone has the responsibility to determine whether the transaction meets the federal standard of reasonably equivalent value, to accord respect to the state foreclosure sale proceedings. While the sale price determined in the foreclosure proceeding cannot be considered conclusive with respect to the issue of federal law before the bankruptcy court, it is an important element in the analysis of that question.

### Conclusion

We hold that the sale price at a regularly conducted, noncollusive foreclosure sale cannot automatically be deemed to provide a reasonably equivalent value within the meaning of section 548(a)(2)(A). We therefore reverse the judgment of the district court and remand to the bankruptcy court for further proceedings not inconsistent with this opinion.

REVERSED AND REMANDED.