**In re Joseph H. McCLINTOCK & Helen J. McClintock, Debtors.**

**Joseph H. McCLINTOCK & Helen J. McClintock, Plaintiffs,**

**v.**

**David C. STOVER & The Federal Land Bank of St. Louis, Defendants.**

Bankruptcy No. 87–01322–2–12.
Adv. No. 87–0169–2–12.

United States Bankruptcy Court, W.D. Missouri.

July 2, 1987.

James E. Thompson, Jr., Harrisonville, Mo., for debtors.

David A. Lander, St. Louis, Mo., for Federal Land Bank.

Rick Fink, Kansas City, Mo., Trustee.

## MEMORANDUM OPINION

FRANK W. KOGER, Bankruptcy Judge.

Debtors filed their petition for relief under Chapter 12 on March 26, 1987. As debtors in possession they promptly followed that up by filing a Complaint in this adversary proceeding against the Federal Land Bank under § 548 to set aside a prior foreclosure that had occurred on May 7, 1986. The Federal Land Bank filed a Motion to Dismiss the Complaint. The parties (who will hereafter be referred to as plaintiff and defendant) have filed a Stipulation of Facts and submitted this fascinating progeny of *Durrett v. Washington National Ins. Co.*, 621 F.2d 201 (5th Cir.1980) and *In re Hulm*, 738 F.2d 323 (8th Cir. 1984) on the pleadings and on their Stipulation.

Briefly the facts, as stipulated, are that prior to May 7, 1986, the debtors had been the owners of 206 acres of farm land. There were four mortgages on that real estate, as follows:

| | | |
|---|---|---|
| First | — Federal Land Bank— | $ 135,000.00 |
| Second & Third | — Farmers Home Administration— | 588,830.50 |
| Fourth | — Farm Credit Services— | 400,000.00 |
| | | $1,123,830.50 |

The second and third were also secured by other collateral with a stipulated value of $75,000.00, so that the total indebtedness was only $1,048,830.50 or $5,091.41 per acre. Even that figure reinforces both this Court's high opinion of the fertility, fecundity and superiority of Missouri farmland, and its low opinion of the degree of good sense of the various governmental units that have been so busily handing out taxpayers' money in the form of loans to persons engaged in farming. All of the loans were in default on May 7, 1986, and the debtors were insolvent. The defendant cried its foreclosure sale and was the successful bidder at $135,000.00. That figure undoubtedly represented the defendant's debt, interest and costs and there were no higher bids even though the parties agree and have stipulated that the fair market value on May 7, 1986, was $195,000.00.

Based on these stipulated facts, the plaintiffs pray the Court set aside the sale and order the defendant to transfer the farm back to the plaintiffs. On the other hand, the defendants move to dismiss the complaint. Defendants' theory is that plaintiffs have no valid complaint since even if the property had sold for more than twice its fair market value, the debtors would still have received nothing and, therefore, no loss was suffered by the debtors and no recovery can be had under § 548.

Rather than adopt either the plaintiffs' theory or the defendants' theory, the Court chooses and will implement a third theory which will probably be equally unsatisfying to both parties. Starting with the Fifth Circuit decision in *Durrett v. Washington National Insurance Co.*, 621 F.2d 201 (5th Cir.1980) the spector of a § 548 fraudulent transfer claim has plagued every creditor in a foreclosure action, and established a new Statute of Limitations in such proceedings. In 1984, the Eighth Circuit Court of Appeals in *In re Hulm*, 738 F.2d 323 set up the guidelines and standards that are controlling in this case. To paraphrase, the Court said that any foreclosure that did not produce a *reasonably equivalent value*, was a fraudulent transfer under § 548 provided the other necessary statutory requirements were met. In the *Hulm* case, however, the question of the effects of a second or a third or a fourth mortgage which together not only exceed but overwhelm the fair market value of the foreclosed property was not answered. Therefore, it is the obligation of this Court to determine what, if any, effect such junior liens have upon the doctrine enunciated in that case.

■ This Court concludes that the existence of said junior liens does not control whether a reasonably equivalent value was obtained at the foreclosure. The effect of foreclosure of a senior lien is to wash away or eliminate the lien position of the junior creditor. The debts thereby secured remain, but it becomes an unsecured debt

and the purchaser takes his title free and clear of any remaining pledge of the property. For that reason, the fact that the junior lienholder does not choose to bid or does not choose to protect his lien may merely reflect that the cost of said act is deemed disproportionately expensive to said junior lienholder. Probably no one would tie up one million dollars to protect $100,000.00 what with the cost of money, the uncertainty of salability, and the prospect of potential eviction proceedings if the debtor does not voluntarily vacate after foreclosure. However, all of these factors go primarily to the business decision of the junior lienholder whether to bid or not, and only incidentally to the § 548 issue of whether the foreclosure price was a reasonably equivalent value. Were it the second or the third or the fourth lien foreclosing, then defendants' thrust would be unassailable because the senior liens would still be a lien on the real estate and would have to be paid off to clear the title and allow the purchaser to enjoy the fruits of ownership. Therefore the balances due on senior liens is a direct component of reasonably equivalent value while the balances on junior liens is not.

The defendants' Motion to Dismiss the Complaint is, therefore, OVERRULED.

 Now as to the plaintiffs' request that the Court set aside the sale and require that the defendants reconvey the 206 acres of land to the plaintiff, the Court declines to do so. There are several reasons. While the Court agrees that even if the *Durrett*, Ibid., "70% rule" is applied, and that certainly if the *Hulm*, Ibid., "reasonably equivalent value" rule is applied, corrective action under § 548 must be taken to eliminate the "windfall" to the defendant, nevertheless there is a better way to accomplish this. If the Court sets aside the sale, the land will be tied up in litigation for the pendency of the bankruptcy. What action the defendant has heretofore taken in regard to said land was not included in the Stipulation and for all the Court knows it may be transferred or rented already to some third party whose rights would thereby be affected. Clearly, it is too late for plaintiff to plant a crop at this time and the Court can see no benefit in causing reconveyance either with or without revival of the second, third and fourth mortgages. From the schedules debtor filed in the Chapter 12, it would appear that debtor contemplates momentary revival of the second, third and fourth mortgages and then elimination thereof by establishing a valuation of $185,000.00 for the land and wiping out the rest of the balance of the second, all of the third and all of the fourth. Instead, the Court chooses to do as it perceives the Bankruptcy Court in *In re Hulm*, 45 B.R. 523 (Bankr.D.N.D.1984) did and require the defendant to pay $60,-000.00 to the Chapter 12 Trustee, Mr. Rick Fink. The Trustee is to invest the sum in an interest bearing account, until it is determined to whom said funds belong, albeit the debtors in possession or the holder of the second mortgage.

Accordingly, defendant Federal Land Bank is ORDERED to pay $60,000.00 to Mr. Rick Fink, Chapter 12 Trustee.